## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

**PANTHERA ENTERPRISES, LLC,**

                        **Debtor**

**Aaron C. Amore, Chapter 7 Trustee**

**BK No. 2:19-bk-00787**

**Chapter 7**

### CHAPTER 7 TRUSTEE'S MOTION FOR AN ORDER APPROVING THE SALE OF THE DEBTOR'S REAL PROPERTY AND NOVATING CERTAIN GOVERNMENT CONTRACTS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363

Now comes Aaron C. Amore, Chapter 7 Trustee for the Estate of Panthera Enterprises, LLC ("Debtor") and moves this Court for an order approving the sale of the Debtor's Real Property and novation of certain government contracts to Panthera Training LLC free and clear of liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363 ("Motion"). The negotiated terms of the proposed sale will also return funds to the estate to pay the Trustee's Commission related to the sale of the real property and priority administrative expenses and claims, with a small distribution to the unsecured creditors. In support of his Motion, the Trustee states as follows:

#### PRELIMINARY STATEMENT

On June 1, 2018, facing a foreclosure sale and unable to profitably operate its business, the Debtor leased its real property -- its most valuable asset -- to Training for a term of twelve (12) years with three (3) ten (10) year extensions ("Lease"). At the same time, the Debtor and its subsidiary executed an agreement to assign all of their contracts to Training ("Assignment Agreement"). A few months later, but also effective June 1, 2018, the Debtor and its subsidiaries

- 1 -

executed a subcontract with Training ("Subcontract"), confirming the transfer of the performance of their government contracts to Training.

The Trustee has assessed the value of the Debtor's assets in light of the terms of the Debtor's long-term Lease to Training, the Assignment Agreement and the Subcontract, which limit the options available to the Trustee for liquidation. The Trustee asserts that the proposed negotiated sale of the Debtor's Real Property (as defined herein) to Training, in accordance with the terms of a proposed Asset Purchase Agreement, and novation of the government contracts currently performed by Training, for approximately $6.5 million, is the only option that will limit further claims and litigation against the estate, and at the same time, has the potential to provide a return to the unsecured creditors.

The proceeds of sale (i) will be paid to the West Virginia Economic Development Authority ("WVEDA"), which holds a first lien against the Debtor's real property, (ii) will fund a payment to the junior lienholders as an inducement for their consent to release their deeds of trust; (iii) will pay administrative claims; and (iv) is expected to provide a small distribution to unsecured creditors. The Trustee asserts that the sale can be made free and clear of liens pursuant to 11 U.S.C. § 363(f). The junior lienholders have consented or will consent to the proposed sale and all of the other creditors and parties in interest claiming to have liens or an interest in the Real Property are the subject of bona fide dispute.

The proposed sale to Training, free and clear of interests, is in the best interests of the creditors and lies within the Trustee's sound business judgment.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to hear and decide this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are §§ 105 and 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on September 13, 2019, the Friday before a foreclosure sale was to take place on Monday, September 16, 2019.

4.      The bankruptcy proceeding was converted to a Chapter 7 by Order of the Court entered July 21, 2020, and Aaron C. Amore was appointed the Chapter 7 Trustee ("Trustee").  ECF # 202.  The Trustee now seeks an order of this Court approving sale of the Debtor's assets free and clear of liens, claims, encumbrances and any other interests.  To fully appreciate the current status of this case and the proposed sale, we must go back to the Debtor's transactions in 2018, and the events leading up to the bankruptcy filing.

### A.  Operation of the Debtor's Facility and the Debtor's Assets

5.      The Debtor is a Delaware limited liability company, formed as TenX Group LLC in October 2011.  ECF 79, 81.  In 2016, for reasons unknown, the Debtor changed its name to Panthera Enterprises LLC, yet it continued to use the name TenX Group LLC in certain transactions after that.  *Id.*  The Debtor is held 50% by James V. Punelli ("Punelli") and 50% by Raymond C. Jones ("Jones").  ECF 79, ¶ 2.

- 3 -

6.      The Debtor owns 747.49 acres in Moorefield District, Hardy County, West Virginia ("Real Property"), which is the site of a security operations training facility ("Facility"). ECF 81. The Facility includes tactical driving tracks, a vehicle obstacle course, shooting ranges, a live fire shoot house, a mobile operations urban training combat town, an FAA approved helicopter landing pad, an armory and explosives vault, multiple classrooms, on-site dining facilities and off-site lodging.  Training programs are customized for personnel involved in military and non-military protective services, including government, military and law enforcement personnel. *Id.*

7.      The Debtor does not and never has operated the Facility, nor has it provided any of the training that is conducted at the Facility.  ECF 81.  Rather, the Debtor serves as the prime contractor on one or more contracts to provide the specialized training and subcontracts with others to provide the training.

8.      Prior to June 2018, the Debtor leased the Real Property to its subsidiary, Panthera Training Center, LLC ("PTC"), which operated the Facility and provided the training.  ECF 81. Effective June 1, 2018, the Debtor terminated its lease with PTC and leased the Real Property to Panthera Training LLC (defined above as "Training"), an unrelated company.  On June 1, 2018, Training took over operation of the Facility and began conducting the training that the Debtor and PTC had contracted to provide.  *Id*.

9.      PTC is owned 80% by the Debtor.  The remaining 20% is held by David Dolan, but he is not involved in the operation of the Facility.[1]  ECF 79, ¶ 3.  Currently, PTC is the prime contractor on two government contracts for which Training conducts training.  Punelli and Jones are both officers and managers for the Debtor and PTC.  ECF 79, ¶ 6.

---

[1] Mr. Dolan formerly owned the Real Property.

- 4 -

10.    Panthera WorldWide, LLC ("PWW") is a wholly owned subsidiary of the Debtor. This limited liability company owns no real or personal property with its primary asset being a government contract on which it is the prime contractor.  However, over the life of this contract, no training has been conducted, no funds have been received and no funds or training task orders are anticipated as of the writing of this Motion.

11.    The Real Property is the Debtor's primary asset.  It includes a number of fixtures and improvements to the Real Property, including 38 Modular Office Buildings, ("Modular Units"), which are integral to the operation of the Facility.  ECF 23, Schedule A/B.

12.    The Modular Units are fixtures despite Debtor's scheduling them as personal property on its Schedule A/B.  The Modular Units were placed on the Real Property in 2009, and between 2009 and July 2015, they were leased to the Debtor or its predecessor for use at the Facility.

13.    The Debtor purchased the Modular Units in 2015, and thereafter they were permanently attached to the Real Property.  The Modular Units are reasonably necessary to and have been adapted or modified to the purpose for which the Real Property is being used, as a security operations tactical training facility.  They have been modified to serve as, among other things, classrooms, specialized training rooms, a cafeteria and offices.  The Debtor's acquisition in 2015 is evidence of its intent to make the Modular Units a permanent part of the Real Property, i.e., a fixture.  The Trustee incorporates herein by reference the factual allegations and claims stated in the Trustee's Complaint filed February 12, 2021 in Adv. Proc. No. 2:21-ap-00002, *Aaron C. Amore, et al. v. TR&L, LLC et al.*, as well as this Court's Memorandum Opinion entered November 4, 2020, in *Neff v. Panthera Enterprises, LLC et al.*, Adv. Proc. No. 2:20-ap-00010.

14.    The Debtor's assets are also thought to include personal property used in the operation of the Facility.  This may include, without limitation, equipment, furniture, machinery, merchandise, firearms, vehicles, and munitions ("Personal Property").  Together with its Real Property, the Debtor leased all of its Personal Property to Training by that certain Commercial Lease Agreement dated June 1, 2018 (see below).[2]  ECF 52-6, pp. 10-64.  Fifteen days later, on June 15, 2018, (and without the knowledge of Training) the Debtor purportedly sold all of its Personal Property to SMI LLC ("SMI") by a Bill of Sale.  ECF 52-8, pp. 10-13.  Notwithstanding the Bill of Sale, none of the Personal Property was taken from the Facility, and Training has continued to use the Personal Property in operation of the Facility.  ECF 52-6, pp. 2-8, ¶ 24.  The Trustee is not seeking approval to sell the Debtor's interest in the Personal Property with this Motion.

15.    Other than the Real Property and the Personal Property, the Debtor's assets consist of a single contract with a federal government agency (which is being performed by Training), general intangibles associated with the operation of the Facility and the Debtor's interest in the assets of its subsidiaries, PTC and PWW.[3]

B.    **The Debtor's Defaults and the 2018 Transactions**

16.    The Debtor acquired the Facility in 2013, at that time purchasing 689.40 acres of the Real Property.  The purchase was, in part, financed with a loan from the West Virginia

---

[3] Neither PTC nor PWW have any assets of value beyond the potential value of the government contracts for which they have subcontracted with Training to perform, and which would have value to Training if a novation process is accomplished. Both entities have substantial debts with judgments lodged against them, and both are named defendants in a personal injury suit filed by Darrick and Emily Gust, pending in the Circuit Court of Hardy County, West Virginia.

- 6 -

Economic Development Authority ("WVEDA").  WVEDA is the Debtor's largest creditor with a
first priority lien against the Real Property.  ECF 81.

17.     WVEDA made two loans to the Debtor prepetition.  ECF 81.  The first loan was
made August 21, 2013, in the original principal amount of $5,000,000 ("2013 Loan").  The 2013
Loan is secured by a Credit Line Deed of Trust and Fixture filing encumbering the 689.40 acres.
It is also secured by a Collateral Assignment of Leases and Rents.  ECF 81.

18.     The second loan was made one year later, on July 2, 2014, in the original principal
amount of $1,871,505.00 ("2014 Loan" and with the 2013 Loan, the "WVEDA Loans").  This
2014 Loan financed the acquisition of an additional 58.09 acre tract, adjacent to the 689.40 acre
tract.  It is secured by a Credit Line Deed of Trust and Fixture Filing, granting WVEDA a
subordinate lien on the 689.40 acre tract and a first lien on the 58.09 acre tract.  It is also secured
by a Collateral Assignment of Leases and Rents.  ECF 81.

19.     WVEDA filed its secured claim in this bankruptcy case on October 23, 2019 for a
total of $6,477,180.47.  Claim # 4.

20.     The Debtor first defaulted on the WVEDA Loans in February of 2015, not even a
year after the 2014 Loan was made, by failing to make the monthly payments due under the terms
of the respective promissory notes.  The Loans were brought current in May of 2015, but the
Debtor defaulted again in August of 2015, and the Debtor made no payments throughout 2016.
ECF 52-10, pp. 2-6, ¶¶ 9-10.

21.     In May of 2017, the Debtor and WVEDA entered into a modified payment
arrangement whereby the Debtor agreed to pay $20,000 per month for each of the Loans.
However, the Debtor defaulted on the modified payment arrangement.  ECF 52-10, pp. 2-6, ¶¶ 11-
12

- 7 -

22.    On February 28, 2108, WVEDA sent a notice of default and demand for payment to the Debtor and its guarantors, giving the obligors a deadline of March 31, 2018 to cure the default.  Nothing was paid.  ECF 52-10, pp. 2-6, ¶ 13.

23.    WVEDA commenced a foreclosure under the two Credit Line Deeds of Trust that secured the Loans in May of 2018.  ECF 52-10, pp. 2-6, ¶ 14.  Shortly thereafter (and as discussed below), Debtor advised WVEDA that it had entered into certain agreements with Training, as of June 1, 2018, to turn over operation of the Facility to Training.  ECF 52-10, pp. 2-6, ¶ 15.

24.    WVEDA, Debtor, Punelli, Jones and Training then entered into a Forbearance Agreement, effective as of July 6, 2018.  Per its terms, WVEDA agreed to forbear from exercising its rights under the WVEDA Loan documents, and the Debtor, among other things, agreed that the monthly rent payments to be paid by Training to the Debtor under the Lease would be paid directly to WVEDA, to be applied to the WVEDA Loans.  ECF 52-10, pp. 2-6, ¶¶ 16-17.

25.    Training has continued to make its monthly rent payments of $52,000 under the Lease, which are paid directly to WVEDA and applied to the outstanding balances due and owing on the WVEDA Loans.  ECF 52-10, pp. 2-6, ¶ 19.

26.    However, the payment default on the WVEDA Loans was not the Debtor's only default.  In the months preceding the 2018 transfer to Training, the Debtor failed to make any significant debt service payments.  In addition to WVEDA, the Debtor defaulted on his obligations to West Virginia Tax & Revenue, the Sheriff of Hardy County, West Virginia, Howard Shockey & Sons, Inc., West Virginia Paving, Inc., Unity Technologies Corporation, Brian Riso, Bruce Hardy, Azadian Group, LLC, Bill Neff Enterprises, SMI, LLC, Michael Cranston, CPA and Dinsmore & Shohl, LLP. The Debtor's schedules reflect defaults on numerous loan agreements, contracts and debts which resulted in lawsuits and judgments. ECF 23.

27.    In March of 2018, the Debtor granted to SMI, LLC ("SMI") to secure a pre-existing debt of $100,000, the "exclusive rights to all merchantable timber standing or fallen" on the Real Property, in perpetuity.  ECF 52-11, pp. 2-8.  The value of the timber on the Real Property is, without a doubt, far in excess of the purported consideration, and execution of the Timber Agreement creates yet another default under the WVEDA Loans.

28.    At the same time the Debtor was negotiating transfer of the Facility to Training pursuant to the Lease -- which leased not just the Real Property but all of the Debtor's Personal Property -- the Debtor was also negotiating a sale of all of its Personal Property to SMI.  The Bill of Sale dated June 15, 2018 recites consideration of $1.00.  ECF 52-8, pp. 10-13.

29.    The Debtor failed to pay its 2017 real property taxes and in November of 2018, the 2017 tax liens for the delinquent taxes were auctioned by the Hardy County Sheriff and certified to the West Virginia State Auditor's Office for disposition.[4]  The Debtor also failed to pay its personal property taxes.

**C.    2018 Transactions with Panthera Training LLC**

30.    Facing foreclosure, in April of 2018, the Debtor's principals, Punelli and Jones, sought out Mr. Robert L. Starer ("Mr. Starer") as a possible investor in the Debtor's Facility and operation.  Mr. Starer declined to become an investor.  ECF 52-6, pp. 2-8, ¶¶ 5-7.  Instead, Mr. Starer proposed to form a new company, Panthera Training, LLC (defined herein as "Training"), which would lease the Real Property and take over operation of the Facility.  Training would then conduct the training courses the Debtor and PTC were obligated to perform under their contracts with the government and other entities.  ECF 52-6, pp. 2-8, ¶ 8.

---

[4] The Debtor redeemed the Real Property in April and May of 2020.

31.     Training is not affiliated with the Debtor.  ECF 52-6, pp. 2-8, ¶ 1.  It is a wholly owned subsidiary of Historic Arms Corporation, a company owned by Mr. Starer and his wife.  *Id.*  Mr. Starer is manager and CEO of Training.  *Id.*  He has 50 plus years' experience working with challenged companies that range from "Mom and Pop" shops to a NASDAQ publicly traded company.  Among these are several sporting goods stores and firearm training ranges.  Mr. Starer also had conducted firearms training for years prior to taking over the Facility.  ECF 52-6, pp. 2-8, ¶ 2.

32.     A Lease and an agreement to assign all of the Debtor's and PTC's contracts to Training was signed on or about June 1, 2018.  ECF 52-6, pp. 2-8, ¶ 9.  Later in 2018, but effective as of June 1, 2018, the Debtor and its subsidiaries PTC and Panthera Worldwide LLC entered into a Subcontract agreement with Training.  *Id.*

33.     Three agreements govern the relationship between the Debtor and Training:

(i) a *Commercial Lease Agreement*, dated June 1, 2018 ("Lease"), pursuant to which Training leased the Debtor's Real Property and Personal Property for a term of twelve (12) years, together with the right on the part of Training to extend the Lease for three (3) additional ten (10) year periods (ECF 52-6, pp. 10-64);

(ii) an *Agreement* of assignment, effective as of June 1, 2018 ("Assignment Agreement"), with both the Debtor and PTC, pursuant to which all contracts of the Debtor and PTC that involve training and teaching operations at the Facility were assigned to Training (ECF 52-7, pp. 2-5); and

(iii) a *Subcontract*, effective June 1, 2018, with the Debtor and its subsidiaries PTC and PWW ("Subcontract") (ECF 52-7, pp. 7-29), pursuant to which Training agreed to perform the services, i.e., the specialized tactical training, that the Debtor and its

subsidiaries had contracted with third parties to provide at the Facility.   The 2018 Subcontract has an initial term of June 1, 2018 to May 31, 2023, with two options to extend the 2018 Subcontract through May 31, 2026.

**D.    Operation of the Facility After June 1, 2018.**

34.    On June 1, 2018, Training took over operation of the Facility, which includes conducting the specialized training classes that the Debtor and PTC agreed to provide to third parties.[5]   After June 1, 2018, PTC was no longer involved in the operation of the Facility.   ECF 52-6, pp. 2-8, ¶ 10.

35.    Since June 1, 2018, along with other training courses provided to Training's clients, Training has provided all of the specialized training that the Debtor contracted to provide to a government agency and that PTC contracted to provide to a branch of the military under two contracts.   Training has also been available, per the terms of the Subcontract, to provide any training requested under the PWW government contract.   These four government contracts are collectively referred to as the "Contracts".

36.    In keeping with the intent of the Assignment Agreement, the parties sought to have these Contracts assigned to Training.   However, pursuant to 48 C.F.R. § 42.1204, in order to effectuate a transfer of a contract with the federal government, the proposed assignor and assignee are required to submit, and receive approval of, a document called a "Novation Agreement" for each of the government contracts to be transferred.

37.    In keeping with the obligation of the Assignment Agreement to "execute such further documents and undertake such further actions as [are] required" to effectuate the assignment of the Contracts, the parties began the novation process.   They formally executed the

---

[5] To date there have been no training classes to be performed under the PWW contract.

*Subcontract*, effective June 1, 2018, to meet certain requirements of the novation process. The Subcontract reflects that effective June 1, 2018, Training operated as a subcontractor and provided the training under the federal government contracts for which the Debtor, PTC, and PWW, respectively, were the prime contractor.

38.     Further, consistent with the requirements of the Agreement for assignment, and pursuant to 48 C.F.R. § 42.1204, the parties submitted Novation Agreements to the government. The parties were cooperating with the novation process until the Debtor's petition date. Thereafter, the Debtor filed a complaint against Training in an effort to terminate the Lease and the novation process halted. ECF 33.   Nonetheless, Training has continued and continues to conduct training courses under the Debtor's and PTC's federal contracts.

39.     Several months after taking over operation of the Facility, Training learned that the Debtor had sold its Personal Property to SMI under a Bill of Sale dated June 15, 2018 ("Bill of Sale").  ECF 52-6, pp. 2-8, ¶ 24.  The Personal Property sold and itemized on the Schedule to the Bill of Sale is believed to be essentially the same Personal Property listed on Exhibit B to the Lease executed June 1, 2018 with Training.  The Bill of Sale was made by Punelli, Jones, PTC, PWW, and TenX Group LLC -- the Debtor, but using its former name.  ECF 52-8, pp. 10-13.

40.     About the same time, Training learned that the Debtor had entered into a Timber Agreement earlier in the year, pursuant to which it sold to SMI "the exclusive rights to all merchantable timber standing or fallen" on the Real Property. ECF 52-6, pp. 2-8, ¶ 23. The Timber Agreement with SMI was effective March 26, 2018.  ECF 52-11, pp. 2-8.  The Debtor used the name TenX Group LLC, a corporate name abandoned 18 months earlier.  *Id.*  A Memorandum of Timber Agreement was recorded in Hardy County, West Virginia, but under the name of TenX

Group LLC, not Panthera Enterprises, showing the other party to the Timber Agreement to be Theresa Morgoglione, not SMI. *Id.*

41.     In October of 2018, WVEDA entered into a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") with Training. ECF 52-6, pp. 2-8, ¶ 15-16. Training was faced with making significant capital expenditures for maintenance of the Real Property, including among those soil erosion mitigation measures and deferred maintenance. *Id.* Therefore, Training requested WVEDA to sign the SNDA to protect Training's possession and use of the Real Property. *Id.* Pursuant to the SNDA, Training's rent payments would continue to be paid to the WVEDA. ECF 52-8, pp. 2-6.

### E.     The 2019 Foreclosure

42.     The Debtor's Forbearance Agreement with the WVEDA matured on January 6, 2019, at which time, the entire balance due and owing on the WVEDA Loans was immediately due and payable. However, the balance due and owing was not paid. ECF 52-10, pp. 2-6, ¶ 18.

43.     WVEDA learned of the sale of the Personal Property to SMI and the sale of timber rights under the Timber Agreement. In addition, the Debtor failed to pay its 2017 taxes, with the 2017 delinquent tax liens certified to the West Virginia State Auditor's Office for disposition. ECF 52-10, pp. 2-16.

44.     The WVEDA commenced another foreclosure, this time with a sale date of Monday, September 16, 2019. ECF 52-10, pp. 2-6, ¶ 20. The Debtor filed its bankruptcy petition on Friday, September 13, 2019.

F.      **The Bankruptcy Case**

45.      Approximately one month after the petition was filed, the Debtor filed a Complaint against Training, commencing Adversary Proceeding 19-ap-0051 ("AP 51").  The Debtor alleged Training had breached the Lease and sought turnover of the Facility.  ECF 33.

46.      At the outset of AP 51, the Debtor sought preliminary injunctive relief to enjoin Training from possessing, occupying or controlling the Real Property and to require Training to turn over possession of the Real Property to the Debtor.  On December 5, 2019, the Court denied the Debtor's request.  AP 51, ECF 27.

47.      The Debtor was granted two extensions of the exclusivity period to file a plan of reorganization, but there was no development of a plan of reorganization.  ECF 95, 137.

48.      Instead, the Debtor's Operating Reports reflect that monies paid to the Debtor for training conducted by Training were diverted by Punelli to the non-debtor subsidiary PTC. Records obtained by Training showed that the funds diverted to PTC were then paid to Punelli and Jones personally.  ECF 162.

49.      On April 7, 2020, the United States Trustee moved to dismiss or convert the bankruptcy case for failure to maintain adequate insurance.  ECF 112.  On May 7, 2020, WVEDA and Training moved to have the bankruptcy case dismissed or otherwise converted to a proceeding under Chapter 7 for cause.  ECF 132.   On July 21, 2020, the Court entered an Agreed Order converting the bankruptcy case to a proceeding under Chapter 7.  ECF 202.

50.      After the Debtor's case was converted to a Chapter 7 proceeding, the Trustee retained an accountant to examine the books and records of Training and to determine if there was any factual basis for the breach of contract claims asserted against Training.   The Trustee

concluded that the Debtor's claims were "baseless" and AP 51 was dismissed upon a Consent Order with Training.  AP 51, ECF 100.

51.     Creditor Bill V. Neff filed an Adversary Proceeding on February 12, 2020, seeking an order of the Court declaring that he was the owner of the Modular Units, as well as an order in detinue and damages for unjust enrichment.  ECF 97.  The adversary proceeding was resolved on a motion for summary judgment, with the Court holding that the Debtor owned the Modular Units at the time of filing and the Modular Units were property of the Debtor's estate.  *Neff v. Panthera Enterprises, LLC et al.*, 622 B.R. 201, 208 (2020).

52.     On February 12, 2021, the Chapter 7 Trustee, WVEDA and Training filed an adversary proceeding against SMI and others, seeking to void the prepetition transfers to SMI of Personal Property purportedly transferred by the Bill of Sale dated June 15, 2018, and of the timber rights purportedly transferred by the Timber Agreement dated March 26, 2018.  The Complaint also seeks declaratory relief that (i) the Timber Agreement and the rights granted thereunder are subject to the prior liens of WVEDA; (ii) the purported sale of Personal Property of the Debtor pursuant to the Bill of Sale, is subject to Training's rights under the Lease; (iii) the Modular Units are fixtures and as such, are subject to the prior liens of the WVEDA; (iv) to the extent SMI claims any interest in the Modular Units under the Bill of Sale, such interest is subject to the prior liens of WVEDA and subject to Training's rights under the Lease.  ECF 281.

53.     The bankruptcy estate is functionally insolvent with no income being received by the Trustee. The estate has incurred fees and costs through the administration of the estate as well as professional fees to be paid his accountant and auditor. The estate continues to incur monthly fees for software and data preservation for the corporate books, registered agent fees to keep the corporate entities in good standing and monthly expenses for email and website services. The

estate will incur an obligation of Twenty-Five Thousand Dollars ($25,000) come the end of April for property insurance. The estate lacks the resources to continue to pay these expenses. Consequently, there is an urgency to liquidating the Debtor's assets and closing the administration of the bankruptcy estate.

54.     The Chapter 7 Trustee now seeks to sell the Debtor's Real Property, pursuant to 11 U.S.C. § 363, free and clear of any liens, claims, interests or encumbrances.

## AUTHORITY

55.     A trustee, "after notice and a hearing, may . . . sell . . . , other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  For the Court to approve a sale under § 363(b), "the judge must 'expressly find from the evidence presented . . . a good business reason to grant such an application.'"  *In re Daily Gazette Co.*, 584 B.R. 540, 547 (Bankr. S.D. W.Va. 2018), quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

56.     Hence, "[t]he standard to be applied by a court in determining whether or not to approve the disposition of property is whether the Trustee exercised sound business judgment." *U.S. ex rel. Rahman v. Oncology Associates, P.C.*, 269 B.R. 139, 161 (D. Md. 2001).  The Trustee carries the burden to establish sound business reasons for the proposed sale.  *In re Diplomat Const., Inc.*, 481 B.R. 215, 218-9 (Bankr. N.D. Ga. 2012) (citations omitted).

57.     The Court is to "consider all salient factors pertaining to the proceeding . . ." *In re Lionel*, 722 F.2d at 1071.  However, the most oft-cited factors to be considered for the "business judgment" test are:

> (a) a sound business reason exists to sell the property;
> (b) adequate and reasonable notice including a full disclosure of the sales terms has been given to parties in interest;
> (c) the sales price is fair and reasonable; and
> (d) the buyer is acting in good faith.

*In re JL Building, LLC*, 452 B.R. 854 (Bankr. D. Utah, 2011). *See also*, *In re Daily Gazettte Co.*, 584 B.R. at 547, quoting *In re Flour City Bagels*, LLC, 557 B.R. 53, 77-78 (Bankr. W.D. N.Y. 2016); *In re WBQ Partnership*, U.S. Bankr. Court, E.D. Va., Bankr. No. 93-10586; Adv. No. 95-1246, October 3, 1995.

58.   Section 363(f) of the Bankruptcy Code allows the Trustee to sell property free and clear of any interest in the property, if:

 (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
 (2)  such entity consents;
 (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
 (4)  such interest is in bona fide dispute; or
 (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

59.   Section 363(f) is phrased in the disjunctive. Therefore, only one of the enumerated conditions of § 363(f) must be met for any particular interest. *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995); *In re Scimeca Foundation, Inc*., 497 B.R. 753 (Bankr. E.D. Pa. 2013).

60.   The Trustee relies herein upon §§ 363(f)(2) and 363(f)(4). Section 363(f)(2) simply provides that the property may be sold free and clear of interests if the party holding such interest consents to the sale. Much of the case law interpreting § 363(f)(2) is concerned with what is deemed consent and whether a lack of objection after notice may be deemed consent. *See*, *e.g.*, *In re GSC, Inc.*, 453 B.R. 132 (Bankr. S.D. N.Y. 2011) ("Consent pursuant to section 363(f)(2) may be satisfied where an entity has not objected to a sale." (citations omitted)

61.   Section 363(f)(4) of the Bankruptcy Code allows property to be sold free and clear of any interest if "such interest is in bona fide dispute." A bona fide dispute exists if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention

- 17 -

as to the application of the law to undisputed facts. *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 24 Bankr. Ct. Dec. (CRR) 5, Bankr. L. Rep. (CCH) ¶ 75139 (4th Cir. 1993).

62. The movant must offer evidence to show an "objective basis" for the dispute. *See In re Mitchell*, 525 B.R. 38, 71 Collier Bankr. Cas. 2d (MB) 230 (Bankr. M.D. N.C. 2014); *In re Collins*, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995). The Bankruptcy Court need not resolve the merits of the bona fide dispute, but simply determine whether one exists. *In re Byrd* 357 F.3d 433, 437 (4th Cir. 2004); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002) ("The Court is not required to determine the underlying dispute or determine the probable outcome, . . . ").

63. The Trustee herein has identified bona fide disputes regarding the purported liens or interest of several creditors, related to both the Real and Personal Property of the Debtor and its subsidiary entities. For example, the above-referenced Timber Agreement and the sale of Personal Property to SMI were both executed after execution of the Lease with Training and were done to simply assuage the creditor at a time when the Debtor was wrapping up its business operations. No new collateral, cash or other reasonably equivalent value was offered at the time of these transfers. Hence, these transfers are also the subject of the Trustee's claims in a recently filed Adversary Proceeding. Azadian Group, LLC claims to have a security interest in certain assets of the Debtor that are the subject of this motion to sell which are disputed.

**RELIEF REQUESTED**

A.    **The Proposed Sale to Panthera Training LLC.**

64.    The proposed sale of the Debtor's Real Property to Training represents not only the best potential opportunity to generate funds for the bankruptcy estate, but it is the only opportunity for sale of the Debtor's Real Property.

65.    The Asset Purchase Agreement negotiated with Training, a copy of which is attached hereto as **Exhibit A** and is incorporated herein by reference, sets forth the terms of the sale of the Debtor's Real Property, which terms include additional funds to be paid to the bankruptcy estate in consideration for assistance in completing the novation process to transfer the Contracts, and related transactions.  The salient provisions are as follows:

66.     Training will pay Four Million Three Hundred Sixty Seven Nine Hundred Forty and 42/100 Dollars ($4,367,940.42) in cash for Debtor's 689.40 acre parcel together with all fixtures and improvements thereon, including without limitation the Modular Units, and One Million Six Hundred Seventy Five One Hundred Twenty and 11/100 Dollars ($1,675,120.11) in cash for the Debtor's 58.09 acre parcel with all fixtures and improvements thereon, including without limitation any Modular Units.  The proceeds will be remitted to the WVEDA at closing, which, in turn, will release the WVEDA's Deeds of Trust against the two parcels.

67.    Training will pay, at closing, in cash, the Trustee's statutory commission related to the sale of the Real Property under § 326 of the Bankruptcy Code ("Trustee's Commission"), which is estimated to be $205,291.82.

68.    Training will pay all closing costs and fees related to the sale of the Real Property and related fixtures as an additional amount above and beyond the amounts paid to release the deeds of trust against the Real Property and pay the Trustee's Commission.

- 19 -

69.     West Virginia Paving, Inc., holding a subordinate lien against the Real Property, will be paid Fifteen Thousand and 00/100 Dollars ($15,000.00) as an inducement to release its deed of trust lien against the Real Property. Said payment will be made at closing of the Real Property sale with the balance of its claim being paid as a general unsecured debt.

70.     Howard Shockey & Sons, Inc., also holding a subordinate lien against the Real Property,  will be paid Ten Thousand and 00/100 Dollars ($10,000.00) as an inducement to release its lien against the Real Property. Said payment will be made at closing of the Real Property sale with the balance of its claim being paid as a general unsecured debt.

71.     West Virginia Stata Tax Department has several liens against the real property which it will agree to release as part of this sale process. It will seek payment of its claims through the claims process and not through an attempt to enforce its liens against the real property.

72.     Training will pay a total of $25,000.00 to the junior lienholders,West Virginia Paving, Inc. and Howard Shockey & Sons, Inc. collectively.

73.     Training will execute and deliver a recourse non-interest bearing note payable to the order of the Debtor ("Note"), in the approximate principal amount of $290,000 as consideration for the Trustee's time, assistance, and cooperation in completing the novation process for the Contracts to be transferred to Training.

74.     The Note shall be payable in instalments equal to 4% of all gross proceeds received for services rendered by Training under each of the Contracts until such time as each of the Contracts is novated, and thereafter, 8% of all gross proceeds received for services rendered by Training under each of the Contracts until paid in full.  Notwithstanding the foregoing payment terms, the Note will be paid in full no later than September 30, 2024.

75.     Further, Training will withdraw its claim numbers 12 and 13, for, respectively fraud damages in the amount of $1,277,894 and breach of contract damages in the amount of $97,882.94, as well as claim number 18, an unsecured priority claim in the amount of $172,000.

76.     The terms of the Asset Purchase Agreement are conditioned upon entry of a Sale Order as defined therein, approving the proposed terms of sale.

**B.      The Proposed Sale Meets the Business Judgment Rule**

*a. **There exists a sound business reason for the proposed sale.***

77.     This is a Chapter 7 Debtor, to be liquidated.  The Debtor has no employees, and has never operated the Facility.   The Debtor is a landlord and the prime contractor on a single government contract, but it has no income stream.  The rent that is collected for leasing the Real Property is paid directly to the WVEDA for debt service on the Debtor's two loans.  Under the Subcontract, all money paid for training conducted under the Debtor's government contract is paid to Training (ECF 52-7, p. 26); there is no holdback for the Debtor.[6]

78.     The Debtor's Real Property is its most valuable asset.  However, the contractual obligations with Training created by the Debtor prepetition complicate the options available to the Trustee for liquidation of the Real Property.  The Debtor's prepetition agreements significantly limit the potential actions available to the Trustee without creating liability to the bankruptcy estate for breach of the agreements.

79.     The Real Property is burdened with an onerous long-term lease in favor of Training that greatly reduces the marketability of the Real Property to any third party, other than Training.

---

[6] Under the Subcontract, there is potential for income by way of the "additional rent" provision, which is dependent upon the Facility's taxable income.  Already the subject of litigation in this bankruptcy case, this provision has not yet provided an income stream to the Debtor and is not likely to in the near future.

If the Trustee were to terminate the Lease, 11 U.S.C. § 365(h)(1)(A)(ii) allows Training to retain its rights in or appurtenant to the Real Property for the remainder of the Lease term, including the right to possession of the Real Property, and to continue to pay rent to the Debtor or to whomever owns the Real Property.  Training could then offset against the rent due post-rejection damages resulting from the Debtor's failure to perform its contractual obligations under the Lease.

      80.     The Trustee is cognizant of the split of authority with respect to the treatment of a lease interest under §365(h), protecting the tenant after a debtor's rejection, when considering the provisions of 11 U.S.C. § 363(f) for sale free and clear of interests,  with no direct ruling in the Fourth Circuit Court of Appeals.  However, Chief Judge Douglas O. Tice, Jr. conducted an analysis of the relevant decisions and pertinent statutory sections in the case of *In re Zota Petroleum, LLC*, finding that the remedies available under § 365(h) were inconsistent with a § 363 sale free and clear of all liens that included a lease interest.

> Cases disapproving the § 363 sale of leases to extinguish § 365(h) rights also rely upon the legislative history of § 365(h), which is indicative of the desire of Congress to protect the rights of a debtor's tenant. A 1978 Senate Report remarked that under the terms of § 365(h), "the tenant will not be deprived of his estate for the term for which he bargained." S.Rep. No. 95–989, at 60 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5846. The Section–by–Section Analysis of the 1994 amendments to the Bankruptcy Code further reflect a Congressional desire to protect the rights of those who are lessees of debtors:
>
>> This section clarifies section 365 of the Bankruptcy Code to mandate that lessees cannot have their rights stripped away if a debtor rejects its obligation as a lessor in bankruptcy. This section expressly provides guidance in the interpretation of the term "possession" in the context of the statute. The term has been interpreted by some courts in recent cases to be only a right of possession (citations omitted). This section will enable the lessee to retain its rights that appurtenant to its leasehold. These rights include the amount and timing of payment of rent or other amounts payable by the lessee, the right to use, possess, quiet enjoyment, sublet and assign.
>
> Bankruptcy Reform Act of 1994, Section–by–Section Analysis, 140 Cong. Rec. H10752–01 (Oct. 4, 1994).

*In re Zota Petroleum, LLC*, 482 B.R. 154, 161-2 (Bankr. E.D. Va. 2012).

Chief Judge Tice concluded:

> The rights of the tenant may not be extinguished by a § 363 sale; to hold to the contrary would give open license to debtors to dispossess tenants by utilizing the § 363 sale mechanism.

*Id.* at 163.

81.     The *Zota* holding is supported by prior and subsequent decisions. *In re Revel AC, Inc.*, 532 B.R. 216, 61 Bankr. Ct. Dec. (CRR) 55 (Bankr. D. N.J. 2015) (finding that a sale of a debtor's assets free and clear of any interests in property pursuant to § 363(f) does not trump the rights granted to tenants by § 365(h), which allows a lessee to retain its rights under a rejected unexpired lease of real property for which debtor was lessor); *In re Patriot Place, Ltd.*, 486 B.R. 773 (Bankr. W.D. Tex. 2013) (finding the termination by the chapter 11 debtor was ineffective and nothing in the lease required the lessee to be compelled to accept money for its leasehold interest). *See, also*, *Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696 (S.D.N.Y. 2014); In re Samaritan Alliance, LLC, 2007 BL 156456 (Bankr. E.D. Ky. Nov. 21, 2007); *In re Haskell, L.P.*, 321 B.R. 1 (Bankr. D. Mass. 2005); *In re Churchill Properties III, Ltd. Partnership*, 197 B.R. 283 (Bankr. N.D. Ill. 1996).

82.     In sum, then, although the Trustee could terminate the Lease, this would not terminate Training's possession and use of the Real Property.  Any sale of the Real Property would be subject to the long-term Lease with Training.

83.     In the oft chance the Trustee were able to sell the Real Property to a third party subject to the long-term Lease with Training, there are other claims that potentially would be made against the bankruptcy estate.  These claims arise out of the Debtor's and PTC's Assignment Agreement, pursuant to which they agreed to assign all of their contracts to Training, and the federal government's requirements for novation of the federal Contracts.

84.     In the Assignment Agreement, executed on June 1, 2018, the Debtor and PTC agreed to:

> assign and convey to Training their respective rights to all contracts whether labeled as agreements, purchase orders, or task orders (the "Contracts") that involve in any manner the use of portions of the Property by third parties and/or the conduct of any activities, demonstrations, training or teaching operations on or about the Property.

ECF 52-7, p. 3.   Further, the Debtor and PTC agreed that "[i]n order to effectuate this assignment of the Contracts, PTC and/or [Debtor] will execute such further documents and undertake such further actions as required." *Id*.

85.     Novation of a federal government contract, i.e., transfer of the contract to a third party, requires, among other things, that "the entire portion of the assets involved in performing the contract" must be transferred to the third party.   48 C.F.R. § 42.1204(a).   The novation process was started by the Debtor and PTC prepetition, but never completed.

86.     There are approximately three and one half (3.5) years remaining on the Debtor's single government Contract.   If the demand for training continues at its current pace, Training estimates that Contract would have a value of up to $3 million dollars received for training provided.   Consequently, the Contract, and more specifically, novation of the Contract to Training, has real value to Training.   It is highly unlikely novation of the federal Contract would have any value to any other third party.

87.     If the Real Property were sold to a third party, the federal government Contracts would terminate, and consequently, the bankruptcy estate could be faced with significant claims for breach of contract.

88.     One alternative to the Trustee's sale would be to consent to a foreclosure by the WVEDA.   The Debtor waived its right to oppose a motion for relief from stay by WVEDA in the

Forbearance Agreement executed prepetition in June of 2018. The value of the Real Property as situated, even including the Modular Units, is believed to be not more than the debt owed to WVEDA (see discussion below). Hence, there is no financial basis upon which the Trustee can assert that there exists equity beyond what is owed to WVEDA, let alone owed to the consensual junior lienholders, which increases the secured amount by another three million dollars.[7]

89.     If WVEDA were to seek relief from stay and foreclose on the Real Property and fixtures, there likely would be no excess funds returned to the bankruptcy estate. The termination of ownership in the Real Property and fixtures would likely imperil the government Contracts as the Debtor and its related entities would no longer own the assets necessary to perform or to permit subcontracting of its obligations.

90.     If the WVEDA were to take the Real Property in a credit bid, Training would still remain in possession of the Real Property due to the terms of the SNDA. Alternatively, if the Real Property were sold at auction to a third party, Training could be at risk of losing its rights under the Lease. In addition, Training would likely lose its rights under the Assignment Agreement and Subcontract and may be required to rebid on contracts it now services with no guarantee that it will secure said contracts. The potential value of the Contracts through the novation process would be terminated, and the Trustee would be left to abandon the remaining assets associated with the bankruptcy estate and related entities as they would have little to no value to the estate. For all of these reasons, foreclosure does not provide a preferable alternative to the proposed sale.

91.     Training has chosen to not include acquisition of the Personal Property in its terms for purchase. First, it is not clear the Debtor owns all of the Personal Property to sell. In addition,

---

[7] West Virginia Paving, Inc. filed Claim # 8 for $675,318.65; Howard Shockey & Sons, Inc. filed Claim # 7 for $2,700,210.58.

a significant portion of the Personal Property that was identified on Exhibit B to the Lease, and as well, on Schedule A to the Bill of Sale with SMI is no longer in existence and if in existence, is at or beyond its useful life.  To the extent necessary for operation of the Facility, such Personal Property has already been replaced by Training.

92.    Last, the Personal Property is subject to a tax claim by the Sheriff of Hardy County, West Virginia.  See Claim # 5 (claiming secured status against inventory and equipment of the Debtor).  As of the date of filing this Motion, the total personal property taxes due and owing for the years 2016 - 2020 was $59,039.20.[8]  For these reasons, the proposed sale will not include sale of the Debtor's interest in the Personal Property.

### b. *The terms of the sale are fair and reasonable.*

93.    The Trustee refrained from actively listing or marketing the Real Property due to the precarious nature of the government Contracts and the potential harm that could result to Training as a result.  Instead, the Trustee solicited potential buyers informally and fielded several inquiries from prospective purchasers.

94.    Aside from being encumbered by a long-term Lease, the Real Property also has some significant subsidence issues due to poor engineering.  This not only would potentially impact the Real Property's value, but constitutes a liability to the bankruptcy estate.  The nature of the failed engineering and the work to repair it cannot be considered normal maintenance under the terms of the Lease, although Training has begun the remediation and accepts this responsibility as part of its proposed acquisition of the Real Property.  The Real Property also contains an

---

[8] The tax tickets remain in the name of Panthera Training Center, LLC ("PTC"), despite competing claims to the Personal Property.  PTC has not paid the personal property taxes, and notably, despite its claim to ownership of the Personal Property, SMI has not paid the personal property tax liability to the Sheriff of Hardy County.

unknown number/volume of spent lead bullets that could potentially constitute an environmental concern or liability.

95.     Despite numerous communications with the Debtor's creditors and third parties over the last three months, the Trustee was unable to secure any offer whatsoever for the Debtor's assets.  The junior lienholders are unwilling to bid even the amount owed to WVEDA.  One interested party offered that the Real Property would have a value of no more than Four Million ($4,000,000).  A second interested party advised the Trustee that he would have no interest in the real property being sold with the lease remaining and that a free and clear sale estimated value would be between Four and one half Million ($4.5-5.0) to Five Million Dollars.

96.     The sale negotiated with Training will generate a total of $6,543,060.53, which will be paid to the Debtor's first position secured creditor in full with partial payments to two junior lienholders to release the deeds of trust encumbering the Real Property and $290,000 to be paid for the Trustee's Commission on sale of the Real Property and the Trustee's assistance in novating the Contracts to Training.  The latter will make funds available to pay administrative expenses, priority unsecured creditors and unsecured creditors.  The final percentage paid to unsecured creditors will be dependent upon the adjudication of certain objectionable claims through the claims review process.

97.     The Trustee asserts that the terms of the proposed sale of the Debtor's assets to Training are fair and reasonable.  The special circumstances of this case make certain assets of the Debtor valuable to Training, but not valuable to any other prospective purchaser.  Training's offer is not only the best offer made to purchase the Debtor's Real Property, it is the only offer that has even been made.

**c.  The buyer, i.e., Training, has acted in good faith.**

98.     Training has operated the Facility since June 1, 2018.   It has conducted all of the training courses required under the Contracts, and it has maintained the Real Property, using its own funds to begin to remediate the subsidence issues.  Training has also timely made the monthly rental payments under the Lease to WVEDA, as required by the terms of the Lease.

99.     Throughout the pending bankruptcy proceeding, Training has kept the Trustee apprised of training conducted at the Facility and any other notable events.  It has cooperated with the Trustee's requests for information and assistance as needed in administering the bankruptcy case.

100.     Training has, at all times, acted in good faith, and therefore, the Trustee requests a finding of the Court that the purchaser, Training, has acted in good faith within the meaning of § 363(m) of the Bankruptcy Code.

### d. *The terms of the proposed sale have been fully disclosed and notice has been given to all parties in interest.*

101.     This Motion is being noticed under Rules 4001 and 6004 of the Bankruptcy Rules, which will notice the proposed sale to all parties in interest.

102.     A copy of the Asset Purchase Agreement is attached as Exhibit A to this Motion, the terms are outlined above, the Trustee has explained his determination that the proposed sale is in the best interests of the estate and its creditors.  There are no undisclosed agreements relating to the proposed sale.

103.     In conclusion, the Trustee asserts that the sale as proposed is within his sound business discretion and judgment. The Trustee is limited by the terms of the Lease and the other contractual commitments of the Debtor, but has found significant value in the existing Contracts and the novation process to Training that would not exist with any other prospective buyer. The proposed sale pays WVEDA, the first lien holder, along with payments made to the junior

lienholders in consideration for release of their respective deeds of trust, along with administrative costs, fees and commission.

**B.    A sale free and clear of interests.**

104.    The Trustee proposes to sell the Debtor's Real Property free and clear of liens, claims, encumbrances and all interests of whatever kind.   Unlike many of the cases interpreting § 363(f) of the Bankruptcy Code, there are multiple interests in this case to be considered.   The interests and the section of 363(f) on which the Trustee relies are as follows:

A.    *Lien of West Virginia Paving, Inc.*:   West Virginia Paving, Inc. holds a Deed of Trust given by the Debtor, dated August 21, 2013, and recorded in Trust Book No. 277, at Page 355 in the Office of the Clerk of the County Commission of Hardy County.   West Virginia Paving, Inc. filed a secured claim (#8) for $675,318.65. Its Deed of Trust constitutes a valid second deed of trust lien against the Debtor's 689.40 acre tract of real estate.   As part of this motion, the Trustee will obtain the consent of West Virginia Paving, Inc. either directly or by way of this motion to sell the proposed sale of the Debtor's assets to Training.

B.    *Lien of Howard Shockey & Sons, Inc.*:   Howard Shockey & Sons, Inc. holds a Deed of Trust given by the Debtor, dated July 2, 2014, and recorded in Trust Book No. 282, at Page 846 in the aforesaid Clerk's office.   Howard Shockey & Sons, Inc. filed a secured claim (#7) in the amount of $2,700,210.58.   Its Deed of Trust constitutes a valid fourth deed of trust lien against the 689.40 acre tract of real estate; and a second deed of trust lien against the 58.09 acre tract of real estate.   Howard Shockey & Sons, Inc. consents to the proposed sale of the Debtor's assets to Training.

C.      *Lien of Virginia Heritage Bank*:  Presently the land records of Hardy County show a Deed of Trust granted by the Debtor, in favor of Virginia Heritage Bank, dated July 30, 2014, recorded in Trust Book No. 284, at Page 125.  Virginia Heritage Bank is believed to have been acquired by Eagle Bank.  This Deed of Trust constitutes a valid fifth deed of trust lien against the 689.40 acre tract of real estate; and a third deed of trust lien against the 58.09 acre tract of real estate.   Neither Virginia Heritage Bank nor Eagle Bank have filed a proof of claim in this case, and upon information and belief, the obligation secured by this Deed of Trust has been paid.  The Trustee has made several requests for Eagle Bank to prepare and record a release, but as of the filing of this Motion, no satisfaction or release has been recorded.  West Virginia Code §38-12-1 requires a release or satisfaction of Deed of Trust to be recorded within thirty (30) days of the date the debt is satisfied.  Accordingly, this lien is subject to a bona fide dispute under 11 U.S.C. § 363(f)(4).

D.      *West Virginia State Tax Department* consents to the proposed sale and  will release its tax liens as part of this sale, and agrees to seek payment of its claims through the claims process.

E.      *TR&L, LLC successor to SMI, LLC*:  TR&L, LLC may claim an interest in the Modular Units.  The Trustee incorporates by reference his factual allegations and claims made against TR&L, LLC and SMI, LLC in Adversary Proceeding 21-ap-0002, *Aaron C. Amore, Chapter 7 Trustee, et al. v. TR&L, LLC et al.*, filed February 12, 2021 ("AP 21-02").  SMI, LLC was the recipient of a broadly written Bill of Sale dated June 15, 2018, signed by the Debtor and its subsidiaries, as well as Punelli and Jones (collectively the "Seller"), purporting to convey

> all of Seller's rights, title and interest in the assets, inventory, vehicles, office equipment, furnishing, other equipment, munitions, firearms, and other personal

property and equipment owned by the Seller located at Panthera Training Center and located offsite used in the operation of the Panthera Training Center . . .

ECF 52-8.  The consideration for this transfer was one dollar ($1.00).   At the time of this transfer the relevant parties were insolvent.  Further, to the extent TR&L, LLC and SMI, LLC would claim an interest in the Modular Units based upon the Bill of Sale, such interest is subordinate to the WVEDA's first priority lien against the Real Property and fixtures.  TR&L, LLC's and SMI, LLC's interest in the Personal Property, including the Modular Units, is subject to a bona fide dispute under 11 U.S.C. § 363(f)(4).

F.      *Theresa Morgoglione and/or SMI, LLC*:[9]  These parties are expected to assert rights in a Timber Agreement executed on or about March 26, 2018 with Memorandum recorded May 24, 2018 in the aforesaid Clerk's Office, Hardy County, in Deed Book No. 346, at Page 278.  Again, the Trustee incorporates by reference his factual allegations and claims related to the Timber Agreement and made against Theresa Morgoglione and SMI, LLC in Adversary Proceeding 21-02  The Timber Agreement purports to convey timbering rights to the entirety of the Debtor's Real Property, in perpetuity, for consideration of One Hundred Thousand Dollars ($100,000) cash in hand and other valuable consideration.  It does not appear from the records reviewed by the Trustee and the testimony of the principal, Punelli, that any consideration actually changed hands as a result of either Timber Agreement.  On information and belief, it was given simply to assuage a creditor and at a time when the Debtor and its related entities were insolvent.  Further, Theresa Morgoglione's and SMI, LLC's purported interest in the timbering rights is subordinate to the WVEDA's first priority lien against the Real Property and fixtures.   Theresa

___

[9] The original Timber Agreement was executed in favor of  SMI, LLC but later was changed to Theresa Morgoglione with the consideration remaining the same in both agreements.

Morgoglione's and SMI, LLC's interest in the Timber Agreement, and in particular the timbering rights, is subject to a bona fide dispute under 11 U.S.C. § 363(f)(4).

G.    *Central Tie & Lumber, Co.*    Central Tie & Lumber, Co. was scheduled by the Debtor as having a secured claim for $3,177.16 based upon a judgment lien.  However, such judgment lien does not appear in the land records of Hardy County, and Central Tie & Lumber, Co. did not file a proof of claim in this bankruptcy case.  Any purported interest of Central Tie & Lumber, Co. is subject to a bona fide dispute under 11 U.S.C. § 363(f)(4).

G.    *Azadian Group, LLC*:  Azadian Group, LLC filed a claim in the bankruptcy case (Claim #21) and attached a UCC Financing Statement ("UCC") filed in the State of Delaware on December 12, 2016.  The UCC was originally filed by Change Capital Partners Fund I, LLC.  A name change amendment was filed one year later on August 18, 2017, changing the creditor's name to Azadian Group LLC.  The Trustee is without knowledge or information regarding the circumstances under which the security interest was given.  The UCC claims a security interest in (i) any and all amounts owing to Debtor" by customers and in "all other tangible and intangible personal property."   Insofar as Azadian Group LLC is claiming an interest in the Debtor's government Contract (which is the only source of payments), 41 U.S.C. § 6305 prohibits any interest in a government contract from being assigned or pledged to a party other than a bank or "financial institution" as defined therein.  To the extent Azadian Group LLC is claiming an interest in the Modular Units, it failed to perfect such interest by filing its  UCC in Delaware and not in West Virginia.  Further, any such purported interest would be subordinate to the WVEDA's first priority lien against the Real Property and fixtures.  Azadian Group LLC's

purported interest in payments received under the Debtor's government Contract, and in the Modular Units is subject to a bona fide dispute under 11 U.S.C. § 363(f)(4).

105.    In sum, sale of the Debtor's Real Property, along with novation of the Contracts, can be made free and clear of all liens, claims and encumbrances under 11 U.S.C. § 363(f). Creditors' with purported liens, claims or interests in the assets have either consented to the sale, or, alternatively, their lien, claim or interest is subject to a bona fide dispute under 11 U.S.C. § 363(f)(4).

## **CONCLUSION**

106.    The Trustee has determined the proposed purchase of the Debtor's Real Property as described herein is in the best interests of the creditors and this bankruptcy estate.  The negotiated sale will generate a total of approximately $6.5 million, which will be paid to the Debtor's first lien secured creditor and two junior lienholders to release the respective deeds of trust,  pay the Trustee's Commission and pay consideration for the Trustee's assistance in novating the Contracts. The latter will make available funds to pay administrative expenses with a potential distribution to the unsecured creditors.   The proposed acquisition by Training is the best and the only offer made for sale of the Debtor's Real Property.

107.    The junior lienholders have or the Trustee will obtain consent to the sale, and the remaining liens and interests that have been asserted are each subject to a bona fide dispute. Therefore, the sale can be made free and clear of liens, claims, interests, and encumbrances under 11 U.S.C. § 363(f)(2) and (f)(4).

WHEREFORE, Aaron C. Amore, Chapter 7 Trustee for the estate of Panthera Enterprises, LLC respectfully requests this Court to enter an order (i) approving the sale of the Debtor's Real Property to Panthera Training LLC and novation of the government Contracts to Panthera Training

LLC in accordance with the terms described in the Asset Purchase Agreement, free and clear of liens, claims, interests, and encumbrances, pursuant to 11 U.S.C. § 363; (ii) finding that Panthera Training LLC has acted in good faith within the meaning of § 363(m) of the Bankruptcy Code; (iii) finding that the Asset Purchase Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) retaining the Bankruptcy Court's jurisdiction to resolve any controversy or claim arising out of or relating to the Asset Purchase Agreement or breach thereof; (v) finding that the Asset Purchase Agreement and the transaction contemplated thereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by the Debtor; and (vi) granting such other and further relief as the Court deems appropriate.

Dated:  March 29, 2021        Respectfully submitted,
Aaron C. Amore,
Ch 7 Trustee

**/s/ Aaron C. Amore**
Aaron C. Amore, WVSB No. 6455
AMORE LQW, PLLC
206 West Liberty Street
Charles Town, WV  25414
T:  (304) 885-4111
F:  (866) 417-8796
aaron@amorelaw.com
*Counsel for Chapter 7 Trustee Aaron C. Amore*